ESTATE OF SAM WASSERMAN, DECEASED, ROBERT WASSERMAN, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Wasserman v. Commissioner
Docket No. 7107-80.
United States Tax Court
T.C. Memo 1982-271; 1982 Tax Ct. Memo LEXIS 481; 43 T.C.M. (CCH) 1386; T.C.M. (RIA) 82271; May 17, 1982. Tom G. Parrott and Robert O. O'Bannon, for the petitioner. Juandell D. Glass, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $ 31,531.79 in petitioner's Federal estate tax. The *482 only issue for decision is whether the assignment by the decedent of a group term life insurance policy on his life was made in contemplation of death so that the face value of the policy is includable in his gross estate under section 2035. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Robert Wasserman (petitioner) is the duly qualified and acting Executor of the Estate of Sam Wasserman, deceased, under Letters Testamentary granted April 5, 1977. He was a legal resident of Oklahoma City, Oklahoma, when the petition was filed in this case. Sam Wasserman died of a cerebral hemorrhage on February 26, 1977. Petitioner, as Executor of the Estate of Sam Wasserman, timely filed a United States Estate Tax Return (Form 706) with the District Director of Internal Revenue at Oklahoma City, Oklahoma, on November 29, 1977. Sam Wasserman (hereinafter referred to as the decedent) had two children, Robert Wasserman and Rosalyn Joan Rottman (hereinafter referred to as Robert and Rosalyn, respectively). *483 Robert was actively engaged in business with his father. Rosalyn was married to Joel Rottman and formerly lived in Florida. She now lives in Bridgeport, Connecticut. During his lifetime the decedent established a pattern of making frequent and substantial gifts to his son and his son's family, as follows: Date
Donee
Subject Matter
Value
8-1-66
Robert Wasserman
250 shares of
Lyntone Belts, Inc.
$ 18,750.00
12-8-67
Robert Wasserman
100 shares of
Lyntone Belts, Inc.
13,490.00
12-20-67
Robert Wasserman
160 shares of
Lyntone Belts, Inc.
21,584.00
12-20-67
Shirley Wasserman
30 shares each of
and 3 children of
Lyntone Belts, Inc.
Robert and Shirley
Wasserman
16,188.00
1-2-68
Robert Wasserman
30 shares each of
and his 3 children
Lyntone Belts, Inc.
20,235.00
12-31-69
Robert Wasserman
29 shares each of
and his 3 children
Lyntone Belts, Inc.
29,652.50
12-7-70
Robert Wasserman
15 shares each of
and his 3 children
Lyntone Belts, Inc.
15,337.50
12-28-70
Robert Wasserman
39 shares each of
and his 3 children
Sire, Inc. preferred
stock
14,625.00
12-13-71
Robert Wasserman
48 shares each of
and his 3 children
Sire, Inc.
18,000.00
*484 Prior to 1974 the decedent had not made any gifts to his daughter, Rosalyn. During the years prior to 1971, Rosalyn's husband had a substantial income from a family-owned business and Rosalyn enjoyed a high standard of living during such years. In 1971 and 1972, Joel Rottman began to experience financial reversals in his family business which culminated in 1974. Because of such reversals he and Rosalyn were forced to sell their Florida home in 1974 and return to his family home in Bridgeport, Connecticut. Prior to the financial reversals suffered by Rosalyn's husband, the decedent did not feel that Rosalyn needed any financial assistance from him. In fact, Joel informed him that no contributions were needed. During 1971 and 1972 Rosalyn on several occasions advised her father of her concern about her husband's financial reversals. During 1974 the decedent became concerned about the financial problems being incurred by Rosalyn's husband, and he expressed such concerns to his friends and business associates. After her husband's financial reversals, the decedent assured Rosalyn that he would provide her with a source of income that would not be involved in her husband's *485 family business. Therefore, on August 8, 1974, the decedent transferred his interest in a group term life insurance policy to Rosalyn. Such policy was issued by the Travelers Insurance Company and had a face value of $ 100,000. It had no cash surrender or loan value and the proceeds were payable only on the death of the decedent.Robert was the beneficiary of the insurance policy before the decedent transferred it to Rosalyn. On December 30, 1974, the decedent established the Rosalyn Rottman Trust No. S-1. Rosalyn was the sole primary beneficiary under such trust. Decedent retained no dominion or control over the trust.
On July 3, 1975, Rosalyn transferred her interest in the insurance policy to the Rosalyn Rottman Trust No. S-1. During the calendar years 1974, 1975 and 1976, the decedent made cash gifts of $ 6,000 per year to the Rosalyn Rottman Trust No. S-1. The decedent's first wife died in 1967 and he married Estelle Wasserman in 1968. They entered into an ante-nuptial agreement which the decedent had been advised might be subject to attack by a surviving spouse. After the decedent's death, Estelle did attack the validity of the ante-nuptial agreement in the probate *486 proceedings and subsequently a compromise of her rights was reached. The decedent's primary motive for transferring the insurance policy to Rosalyn was to provide her with peace of mind and a source of financial security in view of the financial reversals suffered by her husband. A secondary motive for the decedent's transfer of the insurance policy to Rosalyn was to begin a plan to equalize the prior gifts which he had made to his son, Robert. During the last three years of his life the decedent was the president and chief operating officer of his family business. He was in charge of the financial arrangements and banking relations and actually ran the company. He worked eight hours a day, five days a week, until he died. The decedent was an avid golfer and played two or three times a week during the last three years of his life. In 1974 he played in a four day golf tournament in Majorca. He was proud of his family's history for longevity. The cerebral hemorrhage which resulted in the decedent's death was a spontaneous occurrence which was not directly related to his prior medical problems. [2]
*487 The decedent's testamentary disposition to Rosalyn represented 11.4 percent of his gross estate, excluding the $ 100,000 group term insurance policy assigned to her. His testamentary disposition to her would be 25 percent if the policy is included in his gross estate. In his notice of deficiency dated March 11, 1980, the respondent included the face value ($ 100,000) of the insurance policy in the decedent's gross estate under section 2035 as a transfer made to Rosalyn in contemplation of death. ULTIMATE FINDING OF FACT The decedent's transfer to Rosalyn of his interest in the insurance policy was not made in contemplation of death, but was made because of life motives. OPINION Section 2035(a) provides in general that a decedent's gross estate includes the value of all property transferred by such decedent in contemplation of death.Section 2035(b) provides that a transfer within three years of a decedent's death, unless shown to the contrary, will be deemed to have been made in contemplation of death. Because the transfer of the decedent's interest in the life insurance policy here in question occurred within three years of the decedent's death, the provisions of section *488 2035(b) place the burden on petitioner to disprove the presumption that the transfer was made in contemplation of death. The crucial issue is essentially one of fact--whether, in the light of all the facts and circumstances, the dominant motive in making the transfer was the thought of death or a purpose normally associated with life. . The burden of proof is particularly heavy where the assigned property interest is death oriented as in a group term insurance policy which has no cash surrender or loan value. , affg. a Memorandum Opinion of this Court. As is typical in cases like this, the question is close and the evidence is susceptible to conflicting inferences. Decisions in various cases are also conflicting with a fine line drawn between what transfers are life motivated or death motivated. However, upon consideration of all the relevant facts and circumstances present in this case, we have concluded, and found as an ultimate fact, that the decedent's transfer of his interest in the life insurance policy to his daughter, Rosalyn, *489 was made because of life, rather than death, motives. It would serve no useful purpose for us to discuss the varying factual patterns of the cases previously decided on this issue. Suffice it to say that we think the instant case comes closer to those decisions which have found life motives for the transfer. See, e.g., ; , revg. ; . On this record the clear and unrebutted life motives for the decedent's transfer of his interest in the insurance policy were established to our satisfaction by the following facts: (1) the decedent was in relatively good health at the time of the transfer; (2) the decedent had an established plan of making substantial lifetime gifts to members of his family; (3) the transfer was made for the specific purpose of alleviating Rosalyn's concern over her future financial security; and (4) the decedent began a plan to equalize the gifts made to his children. The *490 essence of respondent's position is that he urges this Court to declare that the transfer of any group term life insurance, which has no cash surrender value and which matures and receives value only upon the death of the insured, is inherently death oriented and is never more than a substitute for testamentary disposition. We are unwilling to do so. The ultimate resolution of the issue must depend upon the dominant motive of the decedent determined upon the basis of all the facts and circumstances presented in each case. See , affd. without opinion ; , affd. per curiam . In our judgment the evidence here of the decedent's life motives compels the conclusion that the assignment of the insurance policy in question was not made in contemplation of death. It therefore follows that the proceeds thereof are not includable in the decedent's gross estate under section 2035. To reflect the disposition of this issue and to allow for the deduction of attorneys' *491 fees and expenses pursuant to section 2053, as alleged in the Amendment to Petition filed herein, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect when the decedent died, unless otherwise indicated.↩
2. Dr. Robert C. Brown, the decedent's physician for years, testified at the trial concerning the decedent's health immediately prior to the stroke. He had also previously prepared a letter dated May 30, 1979, in which he stated that the carebral vacular accident was "totally unpredictable and unexpected."↩